LAW OFFICES OF MYLES S. BREINER

MYLES S. BREINER       4364
1003 Bishop Street, Suite 2150
Honolulu, Hawaii 96813
Tel. No. (808) 526-3426
*Myles@Breinerlaw.net*


REVERE & ASSOCIATES
A Limited Liability Law Company

TERRANCE M. REVERE     5857
CLARISSE M. KOBASHIGAWA  9314
Pali Palms Plaza
970 N. Kalaheo Ave., Suite. A301
Kailua, Hawaii 96734
Tel. No. (808) 791-9550
Facsimile No. (808) 791-9551
*terry@revereandassociates.com*
*clarisse@revereandassociates.com*

Attorneys for Plaintiffs


## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEINETTE KAINOA REYES;<br>DANA K.A. BABA;<br>DARNELL K. MALUYO;<br>ARTEMIO PANLASIGUI, Individually<br>and as Personal Representative of the<br>Estate of DAWNIELLE C.<br>PANLASIGUI, deceased, and as Next<br>Friend to A.P. a minor; TIANA M.<br>SOTO; MAELENE CRUZ; MONICA J.<br>ALVES PERALTO;<br>SHAWNA L. TALLMAN; REYNA M. | ) CIVIL NO. 1:17-cv-00143 DKW/KSC<br>)<br>)<br>) THIRD AMENDED COMPLAINT<br>) FOR DAMAGES; DEMAND FOR<br>) JURY TRIAL; THIRD AMENDED<br>) SUMMONS IN A CIVIL ACTION<br>)<br>)<br>)<br>) |

BANKS; and VICTORIA SAUNOA-        )
PIPER                              )
                                   )
                                   )
                    Plaintiffs,    )
                                   )
       vs.                         )
                                   )
STATE OF HAWAII; NOLAN
ESPINDA; ERIC G. TANAKA;
CHAVON FREITAS; TAOFI
MAGALEI, JR.; BRENT BAUMANN;
GAUTA VAA; JAMES SINATRA;
JOHN DOES 1-25; JANE DOES 1-25;
AND DOE ENTITIES 1-25,

_____ Defendants. _____

## THIRD AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiffs, LEINETTE KAINOA REYES; DANA K.A.

BABA; DARNELL K. MALUYO; ARTEMIO PANLASIGUI, Individually and as

Personal Representative of the Estate of DAWNIELLE C. PANLASIGUI,

deceased, and as Next Friend to A.P., a minor; TIANA M. SOTO; MAELENE

CRUZ; MONICA J. ALVES PERALTO; SHAWNA L. TALLMAN; REYNA M.

BANKS; and VICTORIA SUANOA-PIPER (hereinafter collectively referred to as

"Plaintiffs"), by and through their undersigned attorneys, with their Third

Amended Complaint against the above-named Defendants do hereby allege and

aver as follows:

## INTRODUCTION

Plaintiffs' injuries are the direct and proximate result of Defendant State of Hawaii's failure to properly hire, train and supervise guards and employees at Women's Community Correctional Center ("WCCC"). The hiring and use of said employees in an Adult Corrections Officers ("ACOs") position authorized those persons to act under "color of law," as defined by 42 U.S.C. § 1983. This complaint names four ACOs and one civilian maintenance employee. These Defendants used the WCCC facilities like a gentleman's club, receiving state salaries to obtain any access they pleased, using the inmates as sex-toys, record them and circulate them among themselves. Plaintiffs further allege that the State of Hawaii, Nolan Espinda and Eric G. Tanaka each knew or should have known, established policy, and/or were negligent in their hiring, training and supervision of each of these employees. Allegedly, the civilian employee, Defendant James Sinatra, bragged that WCCC Warden, Defendant Eric G. Tanaka, would protect Sinatra should anyone dare make a complaint against him.

Plaintiffs are ten women, incarcerated at the time of the incidents alleged. They seek compensation for injuries sustained by being regularly sexually assaulted by four Adult Correctional Officers ("ACOs") identified as: CHAVON FREITAS, TAOFI MAGALEI, JR., BRENT BAUMANN and GAUTA VA'A, and

one civilian employee, JAMES SINATRA, all employees of the State of Hawaii, (hereinafter "SOH").

At the WCCC, there is a culture that fosters and cultivates ACO - inmate relationships. The SOH's policy of hiring uneducated, not properly trained male employees and leaving them unsupervised is at the heart of this culture. Defendant SOH's ongoing pattern and practice of ignoring sexual abuse of inmates by both male and female guards and employees at WCCC dates back at least 25 years.

The SOH had prior notice regarding the behavior of several of these guards and maintained an attitude of deliberate indifference. These injuries complained of were foreseeable. In fact, the history of similar abuses is well documented and within the scope and subject of the "Prison Rape Elimination Act of 2003 ("PREA") (42 U.S.0 § 15601 et seq.).

The SOH is under a duty to comply with PREA guidelines.

Plaintiffs have also reported that since the filing of the initial "Complaint," on March 30, 2017, the SOH is allowing continued contact by several of the ACOs who call into the facility to harass and threaten Plaintiffs, ultimately seeking to engage in witness tampering. Despite placing these individuals on administrative leave, the Defendants find other ways to reach Plaintiffs – *i.e.* by continuing to call or relay messages into the prison, seeking Plaintiffs out in public, typically to threaten, intimidate or convince them not to testify.

Upon information and belief, all four ACOs have either been terminated, quit or placed on leave and a criminal investigation is being conducted by the Honolulu Police Department and the City and County of Honolulu, Department of the Prosecuting Attorney for all of the claims involved herein.

Most tragically, Plaintiff Dawnielle Panlasigui (aka Doe 4) committed suicide by hanging herself on February 4, 2018. Plaintiff's father Artemio Panlasigui will be appointed as Personal Representative of her Estate and serve as Next Friend to her minor son, A.P.

Plaintiffs also allege that the very structure and design of the facilities at the WCCC requires female inmates to shower naked in direct plain view of male ACOs.

Upon conducting further discovery, Plaintiffs reserve the right to seek declaratory relief seeking a finding that the Defendant SOH is not in compliance with the PREA standards.

## JURISDICTION

1.    All parties resided or were duly incorporated in the State of Hawaii at the time of the alleged incidents.

2.    All Plaintiffs are residents of the City and County of Honolulu, State of Hawaii.

3.    The situs of the tortious acts is the Women's Community Correctional Center located in Honolulu, Hawaii.

4.      Plaintiffs claims for Injunctive and Declaratory relief are proper under 28 U.S.C. § 1331 (civil actions arising under the laws of the United States), and the United States District Court has original subject matter jurisdiction over this matter against the State of Hawaii.

5.      Plaintiffs' claims for relief are appropriate under 42 U.S.C § 1983 (color of law), and subject matter jurisdiction is proper in the United States District Court for the District of Hawaii.

6.      Plaintiffs' ancillary claims are within the appropriate jurisdiction for the United States District Court for the District of Hawaii.

7.      Upon information and belief, Defendants Nolan Espinda, Eric G. Tanaka, Chavon Freitas, Taofi Magalei, Jr., Brent Baumann, Gauta Va'a and James Sinatra were at all times during the alleged incidents employed by the State of Hawaii ("SOH")

8.      Upon information and belief, Defendants Nolan Espinda, Eric G. Tanaka, Chavon Freitas, Taofi Magalei, Jr., Brent Baumann, Gauta Va'a and James Sinatra were at all times during the alleged incidents, residents of the State of Hawaii.

<u>PARTIES</u>

9.     Plaintiff LEINETTE KAINOA REYES ("Plaintiff Reyes"), also referred to as "Doe 1" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

10.     Plaintiff DANA K. BABA ("Plaintiff Baba"), also referred to as "Doe 2" is and was at all times relevant herein a citizen of the United States of America ("United States") and a resident of the City and County of Honolulu, State of Hawaii.

11.     Plaintiff DARNELL K. MALUYO ("Plaintiff Maluyo"), also referred to as "Doe 3" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

12.     Plaintiff DAWNIELLE C. PANLASIGUI ("Plaintiff Panlasigui"), also referred to as "Doe 4" was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii. Plaintiff committed suicide on or about February 4, 2018. Her father, Artemio Panlasigui will be appointed as personal representative of her estate and will serve as next friend to her minor son.

13.     Plaintiff TIANA M. SOTO ("Plaintiff Soto"), also referred to as "Doe 5" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

14.    Plaintiff MAELENE CRUZ ("Plaintiff Cruz") also referred to as "Doe 6"  is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

15.    Plaintiff MONICA ALVES PERALTO ("Plaintiff Peralto"), also referred to as "Doe 7" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

16.    Plaintiff SHAWNA TALLMAN ("Plaintiff Tallman"), also referred to as "Doe 8" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

17.    Plaintiff REYNA M. BANKS ("Plaintiff Banks"), also referred to as "Doe 9" is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

18.    Plaintiff VICTORIA SAUNOA-PIPER ("Plaintiff Piper"), also referred to as "Doe 10", is and was at all times relevant herein a citizen of the United States and a resident of the City and County of Honolulu, State of Hawaii.

19.    Defendant STATE OF HAWAII (hereinafter "State") is and/or was at all times relevant hereto a governmental entity operating a prison/correctional facility as an employer under the color of law.

20.    Defendant NOLAN ESPINADA ("Defendant Espinada") is currently the Department Head of the Department of Public Safety, employed by the State of Hawaii. He is sued in his official capacity as said Department Head.

21.    Defendant ERIC G. TANAKA ("Defendant Tanaka") is, and was at all times relevant to this Complaint, the Warden of WCCC.

22.    Defendant CHAVON FREITAS ("Defendant Freitas") is, and was at all times relevant to this Complaint, an Adult Corrections Officer ("ACO") employed by the State of Hawaii.

23.    Defendant TAOFI MAGALEI, JR. ("Defendant Magalei") is, and was at all times relevant to this Complaint, an ACO employed by the State of Hawaii.

24.    Defendant BRENT BAUMANN, (Defendant "Baumann") is, and was at all times relevant to this Complaint, an ACO employed by the State of Hawaii.

25.    Defendant GAUTA VA'A, (Defendant "Va'a") is, and was at all times relevant to this Complaint, an ACO employed by the State of Hawaii.

26.    Defendant JAMES SINATRA, (Defendant "Sinatra") is, and was at all times relevant to this Complaint, an employee of the State of Hawaii.

27.    Defendants JOHN DOE 1-25, JANE DOE 1-25, and DOE ENTITIES 1-25 ("Doe Defendants") are fictitious names representing Defendants whose true names, identities, and/or capacities are as yet unknown to Plaintiffs and their counsel, despite their inquiry and due diligence, who are or were in some manner

responsible for or engaged in the activities alleged herein so as to be liable for injuries suffered by Plaintiffs.

28.    Plaintiffs will seek leave to amend this complaint, after discovery has commenced, to more specifically identify any Doe Defendants whose true identities, capacity and actions become known to Plaintiffs through discovery.

## VENUE

29.    Plaintiffs hereby re-allege and incorporate by reference, as if fully set forth herein, all of the allegations contained in the preceding paragraphs above.

30.    As alleged above, the Officer Defendants all reside within the State of Hawaii.

31.    Defendant SOH is domiciled in the State of Hawaii.

32.    As alleged more fully below, all of the Officer Defendants' acts and/or omissions occurred in the State of Hawaii.

33.    Based on the foregoing, the United States District Court for the District of Hawaii is the proper venue for this action pursuant to 28 U.S.C. § 1391.

## I.    FACTUAL ALLEGATIONS

### DOE 1: PLAINTIFF LAINETTE K. REYES

34.    Beginning on or about 2013, Defendant Magalei began making inappropriate comments to Plaintiff Reyes about sex and "giving him head." He encouraged her to have sex with him, fondled Plaintiff's breasts, and would put his

hand down Plaintiff's pants to touch and digitally penetrate her vagina. Defendant Magalei made such demands in exchange for additional food privileges for Plaintiff Reyes. Plaintiff Reyes was called by Defendant Magalei to meet with him at whatever post he was assigned to "hang out" with him or to "pick up newspapers," as a precursor to sex. This occurred regularly and continued on through August 2015.

35.     During the time between 2013 through August 2015, Defendant Magalei would call Plaintiff Reyes to his post and ask her "to clean the gate house." On one occasion, Defendant Magalei told Plaintiff Reyes to pull down her pants so that Defendant Magalei could look at her buttocks while she cleaned. On another occasion, Defendant Magalei pulled up her shirt and sucked on her breasts. In exchange for her compliance, Plaintiff Reyes was allowed to eat Defendant Magalei's ACO designated food. He also provided her with food he brought into WCCC, including granola bars and Fiber One bars.

36.     Defendant Magalei progressed in his sexual coercion during June, July and August, 2015. On numerous occasions he called Plaintiff Reyes to the Control Station, pulled Plaintiff Reyes into the staff bathroom, and forced her to perform oral sex upon him. Plaintiff complied with Defendant Magalei's sexual demands for fear of retribution and punishment. When Plaintiff Reyes made any

indication that she objected to Defendant Magalei's demands, she was written up for rule violations that never occurred.

37.    On or about September 26, 2015 and continuing through October 25,2015, Defendant Chavon Freitas began to encourage and coerce Plaintiff Reyes to visit her in the Control Station at WCCC. It began with simple commands for Plaintiff Reyes to remain in the Control Station with Defendant Freitas. Soon thereafter, Defendant Freitas permitted Plaintiff Reyes to not attend her workline duties, not attend her classes, and to skip or not attend other normal inmate activities. Defendant Freitas provided Plaintiff Reyes with "sick notes," which excused her from her required duties. At some point, Plaintiff Reyes was instructed by Defendant Freitas to watch the camera monitors for approaching ACOs and was required to leave the control room only when another ACO was seen on the camera monitor entering the housing unit.

38.    On several occasions, Defendant Freitas sat with Plaintiff Reyes at dinner at her table in the dining room in front of other inmates and ACOs fraternizing in an open and obvious manner. Such behavior is in contravention of acceptable policies and practices, yet no reports or complaints were noted.

39.    On or about October 1, 2015, Defendant Freitas coerced and convinced Plaintiff Reyes to engage in sexual acts with her in the Ahiki Control Station. Soon thereafter, Defendant Freitas would perform oral sex on Plaintiff

Reyes and received oral sex from Plaintiff Reyes. This occurred in a staff bathroom, in the janitors' closet, and in the kitchen.

40.    On or about October 4, 2015, Defendant Freitas first discussed with Plaintiff the idea they could be married. That day, Defendant Freitas took Plaintiff into a staff bathroom, where they blocked the bathroom windows with large trash bags and spread trash bags on the floor. Defendant Freitas and Plaintiff Reyes proceeded to have sex on the bathroom floor, while another inmate was enlisted to stand watch for other ACOs.

41.    In exchange for continued sexual acts, Defendant Freitas provided contraband for Plaintiff, which included clothing and hair care products. Defendant Freitas also allowed Plaintiff to use her cell phone and to access her Facebook account.

42.    On or about October 19, 2015, Defendant Freitas called Plaintiff into the Control Station and showed her several wedding rings and told Plaintiff to "choose a ring." On or about October 20, 2015, Defendant Freitas proposed marriage and provided Plaintiff Reyes with a 14 karat white-gold wedding band.

43.    Defendant Freitas told Plaintiff Reyes that she loved her, promised to provide Plaintiff Reyes with financial support, and ensured her they would have "a happy life together."

<u>DOE 2: PLAINTIFF DANA K.A. BABA</u>

44.   For the relevant time period on or about September 26, 2015 through October 25, 2015, Plaintiff Baba was an inmate at WCCC.

45.   Beginning in or about March 2015 through October 2015, Defendant Magalei regularly held Plaintiff Baba back from her functions or from the medication line and called Plaintiff Baba to the Control Station. There, he demanded and received oral sex from her in the staff bathroom.

46.   On one occasion, Defendant Magalei sexually assaulted Plaintiff Baba in the control room during "lock-down," which is a time when all inmates should have been confined to their housing units.

47.   Defendant Magalei forced Plaintiff Baba to perform oral sex upon him on at least twenty (20) occasions during the seven month period of time between March 2015 and October 2015. On several occasions, Defendant Magalei threatened Plaintiff Baba and instructed her not to talk to anyone about the forced oral sex.

## DOE 3: PLAINTIFF DARNELL K. MALUYO GILMAN

48.   For the relevant time period on or about August 2015 through October 25, 2015, Plaintiff MALUYO was an inmate at WCCC.

49.   Beginning on or about August 2015 through October 2015, Defendant Magalei exposed himself to Plaintiff MALUYO on two (2) occasions: once in the Control Station when he was masturbating, and a second time when he pulled

down his zipper and pulled out his erect penis at the food-tray slot (the trap door). Instead of pushing service food through the food-slot slot that day, Defendant Magalei exposed himself and asked Plaintiff MALUYO if she "wanted some."

<u>DOE 4: PLAINTIFF THE ESTATE OF DAWNIELLE PAWNLASIGUI</u>

50.    For the relevant time period on or about Apri15, 2015 through October 5, 2015, Plaintiff Panlasigui was an inmate at WCCC.

51.    Beginning on or about April 5, 2015 through October 5, 2015, Defendant Magalei sexually assaulted Plaintiff Panlasigui on six (6) different occasions at WCCC.

52.    On or about Apri1 5, 2015, Defendant Magalei called Plaintiff Panlasigui to the Control Station, where he ordered her into the staff bathroom and forced her to perform oral sex. Defendant Magalei ejaculated into Plaintiff Doe 4's mouth, pulled her to her feet and inserted his fingers in her vagina. Defendant Magalei forced Plaintiff Panlasigui to swallow his semen then laughed at her. Defendant Magalei later taunted Plaintiff Panlasigui about the incident, especially when her boyfriend came to visit her at the WCCC facility.

53.     On or about May 2015, Plaintiff Panlasigui was working in the kitchen at WCCC when Defendant Magalei instructed her to go into an empty side room. There, he held her up against the wall and forced her to perform oral sex upon him. Defendant Magalei tried to pull down Plaintiff Panlasigui's pants to

perform oral sex upon her but she was menstruating. Instead, Defendant Magalei put his hands into Plaintiff Panlasigui's pants and penetrated her vagina with his fingers.

54.    On one occasion or about September 2, 2015 up to October 5, 2015, Defendant Magalei called both Plaintiff Panlasigui and Plaintiff Baba, out of medication line and ordered them to the Control Station bathroom where he received oral sex from Plaintiff Baba while he had his hand in Plaintiff Panlasigui's pants with his fingers inserted in her vagina. On that occasion, another ACO, who was concerned about Plaintiff Baba and Panlasigui's absence from the medication line, and even asked Plaintiff Panlasigui if she had something "going on" with Defendant Magalei. A second ACO asked Plaintiff Panlasigui the same question and informed her that the ACOs were talking about her being with Defendant Magalei.

55.    On or after September 2, 2015 and up to October 5, 2015, Defendant Magalei again attempted to call Plaintiff Panlasigui to the Control Station and another ACO stopped her and called the Watch Commander. Plaintiff Panlasigui was stopped and told to return to her cell. Plaintiff Panlasigui is informed and believes the Watch Commander was informed of this incident.

56.    Defendant Magalei taunted Plaintiff Panlasigui threatening to tell her boyfriend about their encounters during the period of time he was sexually

assaulting her. He belittled her and caused her to live in a constant state of fear and anxiety that her family would find out about the sexual assault. In exchange for her silence about the assault, Defendant Magalei would allow Plaintiff Panlasigui to eat the extra food intended for the ACOs.

57.     Plaintiff suffered severe emotional and psychological distress as a result of Defendants conduct and repeated threats and abuse.

58.     On or about February 4, 2018, Plaintiff hung herself at a construction site.

59.     Plaintiff's father, Artemio Panlasigui will be appointed as personal representative of her estate and will serve as next friend to her minor son, A.P.

<u>DOE 5: PLAINTIFF TIANA M. SOTO</u>

60.     For the relevant time period on or about September 26, 2015 through October 25, 2015, Plaintiff Soto was an inmate at WCCC.

61.     On or about March 2015 through December 20, 2015, Plaintiff Soto was working as a "janitor" on the WCCC work line. During that time, Defendant Baumann began to make sexual requests of her.

62.     Plaintiff Soto performed oral sex upon Defendant Baumann on approximately nine (9) occasions, and almost each time Defendant Baumann was seated on a chair in the Olomana Control Station. He regularly ejaculated into Plaintiff's mouth. During one oral sex session Defendant Baumann used his cell

phone to videotape Plaintiff Soto performing oral sex on him. During another session, Plaintiff Soto and another female inmate performed oral sex upon Defendant Baumann in the staff bathroom at the Olomana Control Station together.

63.     In exchange for the sexual acts, Defendant Baumann rewarded Plaintiff Soto with contraband, including eye liner, mascara, lipstick, a double-sided mirror, candy, chocolate covered strawberries, hair bands and other items.

<u>DOE 6: PLAINTIFF MAELENE CRUZ</u>

64.     For the relevant time period on or about October 2015 through November 2015, Plaintiff Cruz was an inmate at WCCC.

65.     On or about October and November 2015, Defendant Baumann encouraged and coerced Plaintiff Cruz to engage in sexual acts with him in the Olomana Control Station. Defendant Baumann penetrated Plaintiff Cruz's vagina with his fingers and fondled her breasts. Defendant Baumann then demanded oral sex. On one occasion, he ejaculated onto his own uniform and he demanded Plaintiff Cruz clean the semen off of his uniform.

66.     On another occasion in or about October or November 2015, Defendant Baumann and Plaintiff Cruz were in the Olomana Control Station. Defendant Baumann instructed Plaintiff Cruz to perform a lap dance for him while she was naked from the waist down.

67.     In exchange for Plaintiff Cruz's sexual activities, Defendant Baumann provided Plaintiff Cruz with contraband, including candy, e-cigarettes, make-up, access to a cell phone, access to the Internet and Facebook, and allowed her to eat food designated for the ACOs.

## DOE 7: PLAINTIFF MONICA J. PERALTO

68.     On or about September 26, 2015 through November 26, 2015, Plaintiff Peralto was an inmate at WCCC.

69.     Beginning in or about September 2015, Defendant Baumann began approaching Plaintiff Peralto to engage in sexual acts with him, suggesting that he could "take care of her sexual needs." He made comments about her body and rubbed up against her in a sexually suggestive way, encouraging her to have sexual relations with him. On two occasions Defendant Baumann brought Plaintiff Peralto to the Olomana Control Station to offer her food in exchange for sexual activities. Defendant Baumann continued to pressure, encourage, and entice Plaintiff Peralto to allow him to film her using a dildo that he suggested he could provide for her.

70.     On one occasion when Plaintiff Peralto was in the Olomana Control Station, Defendant Baumann showed Plaintiff Peralto a videotape on his cell phone depicting Plaintiff Soto performing oral sex upon Defendant Baumann and Defendant Baumann ejaculating in her mouth.

71.     On or about November 26, 2015 Defendant Baumann carried a dildo into WCCC for Plaintiff Peralto. Plaintiff Peralto understood from Defendant Baumann that she was to use it while he filmed her inserting it into her vagina. Plaintiff Peralto reports it is only because of scheduling difficulties, Defendant Baumann never had the opportunity to actually film Plaintiff Peralto using the dildo he carried into WCCC for her.

## DOE 8: PLAINTIFF SHAWNA L. TALLMAN

72.     From July 2015 through December 2015, Plaintiff Tallman was an inmate at WCCC.

73.     Beginning in July 2015, Defendant Va'a initiated a relationship with Plaintiff Tallman. Defendant Va'a brought Plaintiff Tallman headphones upon her request.

74.     On or about August 15, 2015 on the "third watch," Plaintiff Tallman and Defendant Va'a had sexual relations in the Control Station next to the refrigerator while another ACO went outside to smoke. Another inmate was asked to act as a lookout for other incoming ACOs. Defendant Va'a inserted his fingers in Plaintiff Tallman's vagina and performed oral sex on her. Plaintiff Tallman then performed oral sex on Defendant Va'a. Defendant Va'a instructed Plaintiff Tallman to swallow his semen.

75.     Between September 1, 2015 and October 17, 2015, Defendant Va'a would visit Plaintiff Tallman at her cell during "lock-down." Defendant Va'a would masturbate in front of Plaintiff Tallman's cell and make her place her hands through the hatch while he rubbed his erect penis on her hands. Defendant Va'a would ejaculate on Plaintiff Tallman's hands and have her lick his semen off her hands. When Defendant Va'a served Plaintiff Tallman lunch or dinner at her cell Defendant Va'a demanded that Plaintiff Tallman be naked. He would grab Plaintiff Tallman's vagina and rub it or fondle her breasts before he fed her. On or about the first week of December 2015 on "second watch, "Plaintiff Tallman went to the Control Station and Defendant Va'a placed his hands in Plaintiff's pants and inserted his fingers into her vagina while he was kissing her. That same day, on the "third watch," Plaintiff Tallman remained at the Control Station with Defendant Va'a, while another ACO left to take other inmates to the medication line. At Defendant Va'a's request, Plaintiff Tallman went into the staff bathroom and removed her pants. Defendant Va'a entered the bathroom and received oral sex from Plaintiff Tallman.

76.     In addition to demanding sex from Plaintiff Tallman, Defendant Va'a also provided contraband, including crystal methamphetamine ("ice"), drug smoking paraphernalia, coffee, makeup, a lighter and even a hypodermic needle.

77.    Plaintiff Tallman, along with her cell mate, Plaintiff Banks, used the crystal methamphetamine received from Defendant Va'a. After four days of methamphetamine use and just before Christmas, Plaintiff Banks attempted suicide by hanging herself in the cell she shared with Plaintiff Tallman.

<u>DOE 9: PLAINTIFF REYNA M. BANKS</u>

78.    On or about September 2015 through December 2015, Plaintiff Banks was an inmate at WCCC.

79.    During December 2015 Plaintiff Banks shared a cell with Plaintiff Tallman. Plaintiff Banks was returning from her shower when she observed Plaintiff Tallman and Defendant Va'a mutually engaged in oral sex. Plaintiff Banks also reports that she believes Defendant Va'a and Plaintiff Tallman were aware that Plaintiff Banks witnessed them having oral sex. Plaintiff Banks did not report the incident at the time.

80.    In exchange for Plaintiff Bank's silence, Defendant Va'a provided contraband to Plaintiff Tallman, including crystal methamphetamine, drug-smoking paraphernalia, coffee, makeup, a lighter and hypodermic needles and suggested that she share the contraband with Plaintiff Banks.

81.    Upon Defendant Va'a's instruction, Plaintiff Tallman shared the methamphetamine and hypodermic needle he provided her with her cell mate,

Plaintiff Banks. After four days of methamphetamine abuse, on or about December 24, 2015, Plaintiff Banks attempted suicide by hanging herself in her cell.

82.    Plaintiff Banks was transported to The Queens Medical Center("Queens") in critical condition and placed on life support. She was partially paralyzed from the neck down and on a feeding tube. Plaintiff Banks remained at Queens for three weeks.

83.    During Plaintiff Bank's stay at Queens, Defendant SOH assigned Defendant Va'a to guard Plaintiff Banks. Defendant SOH stationed Defendant Va'a inside the very room at the hospital with Plaintiff Banks during the majority of her stay at Queens. During that period, Defendant Va'a pressured Plaintiff Banks not to report that he, Defendant Va'a, was having sexual relations with Plaintiff Tallman in their cell, and/or that he provided crystal methamphetamine and paraphernalia to Plaintiff Tallman and Banks.

84.    Plaintiff Banks was partially paralyzed and incapacitated during her three weeks at Queens and could not object to Defendant Va'a being present in her hospital room.

85.    As a result of the methamphetamine induced psychotic episode where Plaintiff Banks attempted suicide, Plaintiff Banks has suffered permanent brain and nerve damage and severe emotional distress.

## DOE 10: PLAINTIFF VICTORIA SAUNOA-PIPER

86.     On or about November 21, 2016 through November 23, 2016, Plaintiff PIPER was an inmate at WCCC.

87.     On or about November 21, 2016 to November 23, 2016, Plaintiff PIPER was assigned to the "janitor" work line under the supervision of Defendant Sinatra.

88.     Upon information and belief, Defendant Sinatra was at all times alleged herein a civilian maintenance employee of the State of Hawaii, that the State of Hawaii entrusted to supervise inmates.

89.     On November 22, 2016, Plaintiff PIPER was in the work line under the direction and control of Defendant Sinatra, when he approached her and spoke to her. Plaintiff PIPER reports that he told her how much he "admires her," "respects her" and how he "could take good care of her if she were in his life."

90.     On November 23, 2016, while on work duty at WCCC, Defendant Sinatra called Plaintiff PIPER into his office and exposed his penis to her, asking Plaintiff PIPER if it will make her happy. Plaintiff PIPER ran out of his office. Defendant Sinatra followed Plaintiff PIPER out of his office, cornered her and told her not to tell anyone about what he said or did. Defendant Sinatra informed Plaintiff PIPER that he was "friends with the Warden," Defendant Eric G. Tanaka, and "no one would believe" her if she reported he exposed himself because she was "just an inmate."

CAUSES OF ACTION

## COUNT I
### (42 U.S.C. § 1983) Negligent Supervision

91.    Plaintiffs re-allege and incorporate by reference all preceding

paragraphs.

92.    Defendant SOH failed to properly screen, hire, train, or supervise their

employees and guards, including, but not limited to allowing female inmates one

on-one contact with male guards, allowing inmates to remain in the Control

Stations with guards for extended periods of time, and failing to investigate

reports of ongoing sexual activities between inmates and ACOs (or civilian

employees).

93.    Defendant SOH had notice of the problem with using poorly trained

and supervised ACOs to supervise female prisoners dating decades.

94.    Defendants SOH, Espinda, and Tanaka failed to adequately train,

supervise or manage the ACOs involved.

95.    Defendants State of Hawaii, Espinda, and Tanaka allowed, ordered,

acquiesced to retaliate against other employees who corroborated, reported, or

confirmed the sexual assaults that were going on at WCCC.

96.    Defendants' actions were the proximate cause of the Plaintiffs'

injuries.

97.   There is no conditional privilege, consent, or applicable defense at law for sex with an inmate.

98.   Defendants, each of them, acted under color of law.

## COUNT II
### (42 U.S.C. § 1983) Policy & Custom of Deliberate Indifference (Policy)

99.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

100.  Defendant SOH failed to provide policies and procedures that insure the safety of the women prisoners under their care and control, including, but not limited to, allowing unsupervised, undocumented, and unverifiable female inmate one-on-one contact with male guards.

101.  Defendants State of Hawaii, Espinda and Tanaka failed to provide policy and procedures that insure the safety of the women prisoners under their care and control, including, but not limited to, allowing female inmates to remain in the Control Stations with male ACOs for no legitimate business purpose without properly logging their movements in a logbook or through electronic video.

102.  Defendants SOH, Espinda and Tanaka failed to provide policies and procedures that insure the safety of the women prisoners under their care and control, including, but not limited to, deliberate indifference to ongoing sexual activities between inmates and ACOs and civilian employees.

103.   Defendants SOH, Espinda, and Tanaka failed to investigate and follow up on reported sexual activities and violations.

104.   Defendants SOH, Espinda, and Tanaka, upon reports from Plaintiffs and other inmates of the sexual activity going on at WCCC did retaliate against certain inmates by causing and conducting searches, cancelling visits and seizing legal material from those inmates.

105.   Defendants State of Hawaii, Espinda and Tanaka, upon reports from other employees of the sexual activity going on at WCCC did retaliate against those employees.

106.   Due to ongoing sexual abuse in WCCC, the State of Hawaii contracted with the Sex Abuse Treatment Center to develop and implement an educational program to help prevent sexual assaults on inmates.

107.   Currently, Defendant SOH has restricted that use to inmate on inmate assaults. Sexual assaults upon inmates by employees are not referred for Sex Assault Treatment.

108.   Defendants, each of them, through the acts and omissions outlined above were the proximate cause of Plaintiffs' injuries.

109.   Defendants, each of them, acted under color of law.

## COUNT III
### (42 U.S.C. § 1983) Policy & Custom of Deliberate Indifference (Systemic)

110. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

111. Defendant SOH failed to provide safe premises that insure the safety of the women prisoners under their care and control including, but not limited to, building and maintaining a structure where the male ACO attended Control Stations looks right into the shower for the women's housing unit. Specifically, the women who chose to shower must do so naked in front of the male ACOs.

112. Defendant SOH failed to provide procedures and premises that insure the safety of the women prisoners under their care and control including, but not limited to, requiring the women to maintain their hygiene, which necessarily includes taking a shower.

113. Defendant SOH failed to provide safe premises that insure the safety of the women prisoners under their care and control including, but not limited to, maintaining a Control Station, which has no 24/7 video monitoring.

114. Defendants Espinda and Tanaka, each or either of them could have changed the policies and procedures which were the cause of Plaintiffs' injuries.

115. Defendants Espinda and Tanaka knew or should have known of the ongoing sexual assaults and retaliation at WCCC. Each could have individually changed the policies and procedures which were the cause of Plaintiffs' injuries.

116. Defendants, each of them, acted under color of law.

## COUNT IV
### (42 U.S.C. § 1983) Policy & Custom of Deliberate Indifference (Ratification)

117.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

118.   In 2003 Hawaii adopted the "Prison Rape Elimination Act" (PREA),45 U.S.C. 15601 et seq., a federal statute enacted to establish compliance guidelines and address the prison sex problem nation-wide. The goal of PREA is to prevent, detect, and respond to sexual abuse/assault and sexual harassment

within confinement settings. PREA establishes a zero tolerance policy for sexual abuse/assault and sexual harassment.

119.   On August 20, 2013, all correctional agencies in the United States were required to be compliant with the PREA standards.

120.   In 2014, according to the Hawaii 2014 Prison Rape Elimination Report, ten (10) staff-on -offender sexual abuse or harassment complaints were filed by inmates at WCCC, with four (4) cases remaining under investigation.

121.   The SOH and Defendants Espinda and Tanaka participated in reporting and documenting of the conditions, policies and investigations under PREA requirements that effectively ratified the current policies and practices. PREA reporting and compliance efforts by Defendants State of Hawaii, Espinda and/or Tanaka fail to address: (1) the use of the Control Station as a preferred place for ACOs to have sex with the women inmates, (2) the number of complaints that arise out of the Control Stations, or (3) even an acknowledgment that there is a problem with the Control Stations, thereby ratifying the use of the Control Stations in the manner they are currently used, managed and supervised.

122.   Ratification of the use of unsupervised Control Stations is further evidenced by the fact the SOH could remedy the situation with simple twenty four hour video surveillance of that area.

123.   Defendants, each of them, acted under color of law.

## COUNT V
### Seduction

124.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

125.   Defendants Espinda, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra, each of each of them, engaged in the tort of seduction with promises of marriage to the respective Plaintiffs.

126.   In promising marriage to certain Plaintiffs, Defendants engaged in sexual intercourse and/or various sexual acts with Plaintiffs under the guise and promise of a future marriage.

## COUNT VI
### Negligence

127.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

128.    Defendants Espinda, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra, each of each of them, were negligent in their actions, omissions, and failures to institute or adhere to proper policies and procedures.

129.   Defendants Espind~, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra had a duty to insure the safety of Plaintiffs while incarcerated.

130.   Defendants Espinda, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra breached their duty to insure the safety of Plaintiffs while incarcerated.

131.   Defendants Espinda, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra's breach of their duty to insure Plaintiffs' was the proximate cause of Plaintiffs' harm.

132.   Defendants Espinda, Tanaka, Freitas, Magalei, Baumann, Va'a, and Sinatra could reasonably have foreseen the consequences of their negligence.

## COUNT VII
**Negligent Hiring, Training and Supervision**

133.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

134.   Defendants Espinda and Tanaka are responsible for the planning and supervision of the screening, hiring, training and supervision of ACOs and employees at WCCC.

135.   Defendants Espinda and Tanaka, through their respective actions and inactions, failed to properly screen, hire, train or supervise Defendant ACOs and employees.

136.   Defendants Espinda and Tanaka's actions and inactions were the proximate cause of Plaintiffs' injuries by and through their failure to properly screen, hire train, or supervise Defendant ACO's and employees.

137.   Defendant SOH is responsible through the doctrine of Respondeat Superior for the Plaintiffs' injuries.

## COUNT VIII
**Assault & Battery**

138.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

139.   Defendants, each of them, either actually or by complicity, are responsible for the sexual assaults of Plaintiffs, which occurred at WCCC.

140.   Alleged assaults are without legal justification.

## COUNT IX
### Intentional Infliction of Emotional Distress

141.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

142.   Defendants Freitas, Magalei, Baumann, Va'a and Sinatra actually knew or should have known their actions would cause Plaintiffs severe emotional distress, and acted with wanton disregard of the rights of Plaintiffs.

143.   Plaintiffs reserve the right to allege this same cause of action against Defendant Tanaka and Espinda upon discovery.

144.   As a direct and proximate result of Defendants' actions, Plaintiffs suffered severe emotional distress.

145.   Plaintiffs hereby re-allege and incorporate by reference, as if fully set forth herein, all of the allegations contained in the preceding paragraphs above.

146.   The acts of Defendants complained of herein were intentional and/or reckless, outrageous, unreasonable, and without just cause or excuse, thereby causing Plaintiffs severe and extreme emotional distress.

147.   Plaintiffs are informed, believe and do thereupon allege that Defendants acted herein knowingly, intentionally, willfully, and/or recklessly, with deliberate indifference for the rights, interests, and/or well-being of Plaintiffs.

148.   Plaintiffs have suffered and/or will suffer various economic, special, general and non-economic damages to be proven at trial.

## COUNT X
**Negligent Infliction of Emotional Distress**

149.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

150.   Defendants, each of them, acted with negligent disregard for the care and welfare of Plaintiffs.

151.   Defendants, each of them, owed Plaintiffs a duty of care.

152.   Defendants breached that duty, and as a direct and proximate result of Defendants' actions, Plaintiffs sustained severe emotional distress.

153.   Defendants and/or Defendant State of Hawaii's administrators, supervisors, corrections officer, counselors and/or other employees and/or staff, acting within the scope of their employment, negligently caused Plaintiffs to suffer severe emotional distress.

154.   Defendants' acts and/or omissions were performed and/or omitted with malice.

155.   The Officer Defendants acted herein within the course and scope of their employment for Defendant State of Hawaii.

156.   Plaintiffs have suffered and/or will suffer various economic, special, general and non-economic damages to be proven at trial.

## COUNT XI
### False Imprisonment

157.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

158.   Defendants, each of them, either actually or by complicity, caused Plaintiffs to be restrained against their will and by force of coercion.

159.   Defendants, each of them, by and through their actions, omissions, or failures to act were the direct and proximate cause of Plaintiffs' injuries.

## COUNT XII
### Wrongful Death

160.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

161.   Defendants, each of them, either actually or by complicity breached their duty of care to Plaintiff PANGLASIGUI by, including but not limited to (a) failing to provide adequate safety; (b) failing to train and supervise its staff; (c) failing to monitor staff and inmates; and (d) failing to take the proper measures to provide for Plaintiff's safety.

162. The actions and misconduct of Defendants, individually and collectively, was a substantial factor in bringing about Plaintiff Panglasigui's serious psychological and emotional injuries, thereby leading to her death, extreme pain and suffering, mental anguish, severe emotional distress and trauma, loss of

enjoyment of life, loss of quality of life and personal dignity, humiliation, and fright.  Costs relating to medical, funeral, burial and/or related expenses; death; and other general and special damages will be provided by her Estate, and is entitled to recover, at the trial of this matter.

163.   Additionally, Plaintiff's minor son has lost the love, care, companionship, society, comfort, affection and guidance of his mother, Dawnielle Panglasigui.

164.   Plaintiff's minor son is also entitled to non-economic damages, per H.R.S. § 663-8.5 and damages as described in H.R.S. § 663-3, including severe emotional and mental distress, grief, and sorrow.

165.   Plaintiff's minor son and father have sustained severe emotional and mental distress, grief and sorrow over the loss of Dawnielle Panglasgiui.

## **PUNITIVE DAMAGES**

166.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

167.   Defendants Freitas, Magalei, Baumann,Va'a, and Sinatra, individually, jointly, separately, or collectively participated in, and/or omitted to perform acts legally required of them in deliberate indifference to a substantial risk of serious harm to Plaintiffs and/or the depriving their liberty interests and rights, and/or

acted with a willful and wanton disregard for the rights and liberties of Plaintiffs or others so situated.

## RELIEF SOUGHT

WHERFORE, Plaintiffs pray for relief, jointly and severally, as follows:

1.  For general damages in an amount to be proven at trial;

2.  For special damages including consequential damages in an amount to be proven at trial;

3.  For punitive and exemplary damages in an amount sufficient to deter similar behavior for those Defendants so applicable;

4.  For reimbursement of costs and expenses herein, including a reasonable provision for attorneys' fees;

5.  Pre and post judgment interest;

6.  For injunctive and declaratory relief as separately plead;

7.  For such further and additional relief as the Court deems appropriate and just.

DATED: Honolulu, Hawaii, October 19, 2018.

/s/Clarisse M. Kobashigawa
TERRANCE M. REVERE
CLARISSE M. KOBASHIGAWA

Attorneys for Plaintiffs